UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TOMMY MCCOY,

    Plaintiff,

    v.

FOSS MARITIME COMPANY,

    Defendant.

Case No. C04-2233L

ORDER ON MOTION IN LIMINE

## I. Introduction

This matter comes before the Court on plaintiff's "Motion *In Limine* Based on the Doctrine of Collateral Estoppel" (Dkt. # 17). Plaintiff Tommy McCoy is a chief engineer for the Foss Maritime Company ("Foss"). McCoy argues in the instant motion that collateral estoppel should serve to preclude Foss from disputing certain factual and legal findings arrived at in a similar case, Montaperto v. Foss Maritime Co., No. 98-1594 (W.D. Wash. Nov. 9, 2000). Foss contends that collateral estoppel should not apply in this case because some of Montaperto's conclusions were based on different factual underpinnings and others were "merely incidental" to the prior judgment. Upon review of the relevant law and the prior action, the Court concludes that collateral estoppel will apply to certain findings of fact and conclusions of law.

ORDER ON MOTION IN LIMINE

## II. Factual Background

McCoy started working for Foss as an ordinary seamen on a tug in 1979. In 1989, he was promoted to chief engineer, and continues to work as one today. The engine rooms of Foss tugs, where the chief engineers work, are dangerously noisy environments, with sound levels well above the level necessary to trigger regulation under the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq. ("OSHA"). Foss took steps to mitigate potential hearing damage after a 1993 OSHA inspection resulted in a fine for failure to implement noise reduction programs. Their efforts included a hearing conservation program and testing of workers' hearing loss. McCoy has complained of some hearing loss during his employment and filed suit against Foss in October, 2004.

Foss was found liable for negligence under the Jones Act in Montaperto. John Montaperto began working for Foss as an ordinary seamen in 1978. In 1982, he was promoted to chief engineer and worked various amounts of time in the noisy engine rooms throughout his career. In 1997 and 1999, Montaperto suffered Standard Threshold Shifts (STS), a decrease of ten or more decibels in the average hearing threshold of either ear. Montaperto sued Foss for negligence in 1998. The case went to trial in September, 2000, and Judge Zilly issued findings of facts and conclusions of law in October, 2000. Final judgment in the case was entered in November, 2000.

## III. Discussion

McCoy now argues that Foss should be collaterally estopped from contesting certain findings of fact and conclusions of law set forth by Judge Zilly in Montaperto. Whether collateral estoppel "is available to a litigant is a question of law," which is reviewed de novo on appeal. Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1114 (9th Cir. 1999). Whether offensive nonmutual collateral estoppel is available to a party to prevent the litigation of an issue is a matter this Court's discretion. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979) (granting "trial courts broad discretion to determine when [offensive issue preclusion] should

apply").

### A. Standard Collateral Estoppel

Collateral estoppel "prevents parties from relitigating an issue of fact or law if the same issue was determined in prior litigation." Resolution Trust, 186 F.3d at 1114. The issues must have been actually litigated and the party asserting collateral estoppel bears the burden of proving that the issues in question are identical to the issues litigated in the previous matter. Id. at 1116. The Ninth Circuit has identified four factors for a court to consider in order to determine whether the issues are the same:

> (1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?
> (2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?
> (3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?
> (4) how closely related are the claims involved in the two proceedings?

Id.; see also RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (1982).

McCoy is suing Foss for negligent conditions on its boats that led to hearing loss. The evidence of negligence includes the history of OSHA regulation of uninspected vessels and Foss's response to these regulations. Factual findings from the same cause of action, for similar harm, and over the same time period satisfy the Ninth Circuit's collateral estoppel test. Thus, collateral estoppel can apply to those factual findings and legal conclusions from Montaperto that overlap with relevant factual and legal inquiries in the instant case.

### B. Offensive Nonmutual Collateral Estoppel

Courts have recognized the availability of limited nonmutual offensive collateral estoppel at the trial court's discretion. See Blonder-Tongue Labs. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971) (abandoning mutuality principle for defensive collateral estoppel claims); Parklane Hosiery, 439 U.S. at 331 (recognizing validity of nonmutual offensive collateral estoppel, with limitations). In Parklane, the Court recognized the two potential sources of abuse of offensive nonmutual collateral estoppel. First, the availability of offensive nonmutual collateral estoppel

for the plaintiff would discourage joinder among plaintiffs, because a plaintiff could seek the benefits of a favorable outcome, but would not be bound by an adverse outcome. Id. at 329–30. The Court addressed this by holding that "where a plaintiff could easily have joined in the earlier action" the trial court should not allow offensive nonmutual collateral estoppel. Id. at 331.

The second possibility for abuse presents itself because a small amount in controversy might not provide the proper incentive for a defendant to vigorously defend itself. It would be unfair for a defendant to be held to the factual findings and legal conclusions of a previous minor action if a new plaintiff with a sizable claim brought suit on the same issue. For this reason "where, either for [this reason] or for other reasons, the application of offensive estoppel would be unfair to defendant" the trial judge must exercise his discretion and not allow it. Id.

The Ninth Circuit has developed its own test for the application of nonmutual offensive collateral estoppel. In order to prevent a defendant from re-litigating an issue of fact or law from a previous action to which plaintiff was not a party, the plaintiff must prove that "(1) [defendant] was afforded a full and fair opportunity to litigate the issues in the prior actions; (2) the issues were actually litigated and necessary to support the judgments; (3) the issues were decided against [defendant] in final judgments; and (4) [defendant] was a party or in privity with a party in the prior proceedings." Resolution Trust, 186 F.3d at 1114.

There is no dispute in the instant case as to the limitations placed by the Supreme Court on the use of nonmutual offensive collateral estoppel. Parklane, 439 U.S. at 331 (unable to join prior action and unfairness). Foss concedes that McCoy would not have been allowed to join in Montaperto's action against Foss.[1] Thus, there is no concern that McCoy was simply lying in wait in order to take advantage of a favorable outcome. Second, it would not be "unfair" to

---

[1] In fact, McCoy's lawyer once tried to bring an action against Foss on behalf of several seamen. Rauch, et al. v. Foss Maritime Co., No. 98-442 (Rothstein, J.). Foss successfully moved to have the additional plaintiffs dropped. Id. (Dkt. # 15).

prevent Foss from re-litigating certain issues. Because McCoy and Montaperto brought actions for similar injuries, Foss had the same incentive to defend itself against Montaperto as it would against McCoy. Therefore, nothing in Parklane counsels against the use of offensive nonmutual collateral estoppel.

The four Resolution Trust inquiries are also satisfied. First, Foss was afforded a full and fair opportunity to litigate the facts and legal conclusions in the Montaperto action. The parties had an opportunity to present their arguments in a week-long bench trial. Second, it is clear that the issues were necessary to support the final judgment. This prong is of greater concern where a final judgment could conceivably rest on a number of different theories. See, e.g., Resolution Trust, 186 F.3d at 1115–18. Here, plaintiff is able to establish the exact findings of fact and conclusions of law upon which the Montaperto court relied because those conclusions were specifically enumerated in the court's order. Finally, the Montaperto findings of fact and conclusions of law were final judgments in an action to which Foss was a party.

The doctrine of collateral estoppel exists to prevent a party from having a second chance to make their case after they have already received a full and fair opportunity to present their arguments in court. Nonmutual offensive collateral estoppel is designed to mitigate the expenditure of scarce judicial resources on issues that have already been decided. It is clear in the instant case that there are several ways for the Court to promote efficiency by adopting findings of fact and conclusions of law from the substantially similar action in Montaperto.

**C.    Findings from Montaperto that Foss is Collaterally Estopped from Challenging**

Based on the foregoing reasons, Foss is collaterally estopped from re-litigating the following findings of fact and conclusions of law from the Montaperto action (the numbers correspond to the numbers used in the Montaperto order):

FINDINGS OF FACT
(5–24, 31–32)

5. Prior to 1984 there was a conflict between two federal agencies, OSHA and the Coast Guard, as to jurisdiction over working conditions of seamen aboard uninspected vessels. Prior to that time, it was unclear whether the Occupational Safety and Health Act of

1970, 29 U.S.C. §651 et seq. (OSHA), or the Coast Guard under Title 14 and Title 46 of the United States Code provided jurisdiction for the regulation of working conditions of seamen aboard uninspected vessels operating on navigable waters. In Secretary of Labor v. Dillingham Tug and Barge Corp., 10 O.S.H. Cas. (BNA) 1859, 1982 WL 22639 (O.S.H.R.C. 1982), the Occupational Safety and Health Review Commission held that the Coast Guard had exclusive jurisdiction with respect to the working conditions of seamen aboard vessels operating on navigable waters. Pursuant to OSHA, the matter was appealed to the Court in Donovan v. Red Star Marine Services, Inc., 739 F.2d 774 (2nd Cir. 1984). The Donovan Court held the Coast Guard was not exercising its statutory authority sufficiently to regulate comprehensively the working conditions of employees aboard uninspected vessels. As a result, the Donovan Court held that OSHA possesses the statutory authority to regulate the working conditions of seamen aboard uninspected vessels. "Hence, OSHA may regulate noise hazards aboard uninspected vessels." Donovan, 739 F.2d at 780. (footnote in findings:  It was not until 1998 that the jurisdiction of OSHA was fully established in the Ninth Circuit for noise related injuries to seamen on uninspected vessels. See Herman v. Tidewater Pacific Inc., 160 F.3d 1239 (9th Cir. 1998).)

6. Beginning as early as 1971, and revised in 1974, OSHA had promulgated regulations relating to noise conservation standards which required baseline audiograms and subsequent annual audiograms for employees who were exposed to work related noise above the time weighted average of 85 dB(A) per 8-hour work day. See 29 CFR 1910.95. OSHA regulations also limited a worker's noise exposure to 90 dB(A) for an 8-hour exposure.

7. In June 1982, the Coast Guard promulgated the Navigation and Vessel Inspection Circular No.12-82 ("NAV1C 12-82"), that contained recommendations for the control of excessive noise aboard inspected vessels. See Exhibit lA. The purpose of NAVIC 12-82 was to provide recommended guidelines developed "in consideration of the need for protecting crewmembers from noise exposures which may produce permanent noise induced hearing loss." Exhibit 1A at 00006. NAVIC 12-82 by its terms only applied to inspected vessels. Although the guidelines were not directed specifically to uninspected vessels, the Coast Guard "consider(ed) them to be appropriate guidelines should any owner of uninspected vessels also choose to follow them." Id. NAVIC 12-82 recommended, in part, that a worker not be exposed to cumulative noise exposure during a complete 24-hour day of more than 82 dB(A) (77 dB(A) for new vessels). The Coast Guard a1so concluded that the most meaningful method of evaluating excessive noise in the maritime industry is by measuring cumulative noise exposure during the complete 24-hour day. Id. at 2-3.

8. Sound occurs when atmospheric pressure waves stimulate the ear's hearing mechanism. Sound is characterized by frequency and intensity. Frequency is the rate at which pressure waves are produced measured in Hertz (Hz) or cycles per second. The actual pressure level or intensity is commonly expressed in decibels (dB). See Exhibit A-47 at Foss 0344. Most people hear in the frequency ranges of 20 to 20,000 Hz. Normal speech occurs between 1000 and 2500 Hz. A sound level measurement may be taken with the measuring meter set on a particular scale. The "A" scale filters out much of the low frequency noise, thus allowing a more precise measurement of high frequency noise, which is more harmful and annoying than low frequency noise. A decibel measurement using the "A" scale, or "dB(A)," provides the best single measurement of the noise.

9. The effect of noise on hearing is a function of the actual noise level, its component

frequencies and duration of exposure. Since at least 1984, OSHA has restricted noise exposure limits to 90 dB(A) on an 8-hour basis, 29 CFR 1910.95(c)(1) and the Coast Guard has limited noise exposure to 80 dB(A) on a 24-hour basis. These are essentially identical requirements. In other words, noise exposure of 90 dB(A) for 8 hours is the same as 80 dB(A) over a 24-hour period.[2] See Exhibit A-47 at Foss 0311. Sound or noise energy doubles every 3 to 5 decibels. The "exchange rate" is the increase or decrease in decibels corresponding to twice (or half) the noise dose. This means that using a 5 dB exchange rate, the sound level of 90 dB(A) produces twice the noise dose that 85 dB(A) produces (assuming that duration is held constant). See Exhibit 81 at 3. OSHA uses an exchange rate of 5 dB; NOISH recommends an exchange rate of 3 dB. The Court concludes that the OSHA exchange rate is more applicable for determining the standard of care in this litigation. This OSHA exchange rate table is set forth in Exhibit A-47 at Foss 0311. Eight hours at 90 dB(A) is equal to four hours at 95 dB(A) or two hours at 100 dB(A). See also 29 CFR 1910.95 Table G-16, appendix A. See also Exhibit 73 which contains a graph showing the relationship between duration and noise level

10. By the mid-70's, Foss became aware that overexposure to excessive engine room noise could cause noise induced hearing toss to their employees. In July 1977, Foss' Management Safety Committee reported to J.D. Minkler on "BASE LINE AUDIOGRAMS," and concluded that although audiometric testing was required: "Any testing [audiograms of employee's hearing] could trigger a mass action and there is a high probability we would be forced to pay for hearing loss, regardless of where/when the loss occurred." See Exhibit 61. Foss was aware of the high levels of noise in its tugs' engine rooms by 1973. A Foss internal memorandum dated April 10, 1978 regarding "Engine Noise Reduction" noted that the average noise in the engine room of its tug fleet was 106-112 dB(A) and top deck control station levels were at 90-96dB(A). See Exhibit 1B at Foss 0479-80. This memorandum included the following Table taken from the OSHA Table G-16:

> "The current OSHA 90 dB in 8 hours requirement actually states in detail:
>
> 8 Hour exposure to 90 db
>
> 6 Hour exposure to 92 db
>
> 4 Hour exposure to 95 db
>
> 3 Hour exposure to 97 db
>
> 2 Hour exposure to 100 db
>
> 1 1/2 Hour exposure to 102 db
>
> 1 Hour exposure to 105 db
>
> 1/2 Hour exposure to 110 db
>
> 1/4 Hour exposure to 115 db"

---

[2] This Court's examination indicates that these are similar requirements, but not the same. According to the formula employed in this paragraph, noise exposure of 90 dB(A) for 8 hours is the same as 80 dB(A) over a *32*-hour period, not 24. This matter can be further explored at trial, if necessary.

ORDER ON MOTION IN LIMINE

This same chart appears at 29 CFR 1910.95, Table G-16. See Exhibit A-47 at Foss 0311.

11. By 1982, OSHA required all employees exposed to 85 dB(A) for an 8-hour period to be subject to an OSHA compliant hearing conservation program that included quality hearing protection, training in the need and use of hearing protection, baseline and annual audiograms to both identify and counsel workers suffering STSs in hearing, to assess whether the workforce generally was suffering hearing loss and to make engineering changes to reduce noise. 29 CFR 1910.95(c)(1). OSHA required employers to have all employees tested with annual audiograms by March 1, 1984.

12. Industrial or noise induced hearing loss occurs in the higher frequencies only. An "STS" is a 10 decibel reduction in hearing acuity in three of the higher frequencies, 2000, 3000 and 4000 Hz, from an employee's baseline audiogram. All hearing conservation programs including OSHA use this as a guide to determine whether a worker has suffered noise induced hearing loss. A threshold shift can be temporary (hearing usual1y returns to normal after several hours) and permanent (a loss of hearing that is not treatable). Permanent threshold shift occurs initially in the range of 3000 to 6000 Hz but is most prominent at 4000 Hz. See Exhibit A-47 at Foss 0346.

13. OSHA. requires the employer meet with any employee whose audiogram discloses an STS and counsel them on hearing conservation and retrain and fit them with hearing protection. 29 CFR 1910(g)(8)(ii)(B). NAVIC 12-82 required similar procedures. See Enclosure 5, to Exhibit lA.

14. At all times material after 1982, OSHA regulations prohibited noise exposure of more than 8 hours at 90 dB(A) (without reduction for hearing protection) and used a 5 dB(A) exchange rate. This means that a worker without hearing protection could only spend l5-30 minutes in an engine room with a measured noise of 110 to 115 dB(A). See Finding of Fact 10.

15. At all times material the average noise in the Foss engine rooms has been in the average range of 110 dB(A) or higher. Foss noise surveys have measured levels as high as 115-119.5 dB(A). See Exhibit 40 at Foss 000133. Dwayne Laible testified at trial that the noise in the Foss engine rooms is generally in the order of 110 dB(A) in all engine rooms. Although Foss has implemented changes to mitigate noise in the engine rooms during the last 20 years, increases in engine power has maintained a fairly constant noise level in the engine room of the defendant's tugs.

16. After NAVIC 12-82 was published in June 1982, Foss became familiar with its requirements. By internal memorandum dated June 29, 1982, Tom Dyer a naval architect working for Foss between 1975 – 1984, wrote that "[i]t is now clear that the Coast Guard is asking us to meet 24-hour effective exposure levels on towboats and are not restricting these levels to vessels over 1600 gross tons." Exhibit 1B at Foss 0448. Dyer recognized that although NAVIC 12-82 only applied to inspected vessels, the Coast Guard recommended that the same limits of noise exposure apply to the Foss uninspected tugs.

17. In May 1982 USCG Capt. T. F. Tutwiler wrote to Steve Scalzo, then Foss' Operations Manager, telling him that the USCG had "little room to deviate from the prescribed (24 hour) limit of 77 dB(A)," the 24-hour equivalent of OSHA's 90 dB(A) for 8 hour limit. He also reminded Foss:

> "Another set of constraints which we must consider are the criteria prescribed by

the Occupational Safety and Health Administration (OSHA) which are the 8-hour exposure limit of 90 dB(A) and the 8-hour exposure level of 85 dB(A) which triggers the hearing conservation requirement. These criteria are well accepted and not considered to be very severe."

See Exhibit 7. Foss was asked if it cared to comment on the OSHA criteria.

18. In 1983, the Coast Guard and the Occupational Safety and Health Administration of the Department of Labor entered into a Memorandum of Understanding, Exhibit 3. This clarified the Coast Guard's preemption regarding inspected vessels.

19. In March 1984, Dyer sent an internal memorandum to Steve Scalzo, then Foss' Vice President of Operations, reviewing the requirements of NAVIC 12-82 and recommended noise exposure limits, the use of hearing protective devices, and a hearing conservation program for the Foss fleet. The hearing conservation program included the instruction of exposed persons on the hazards of high noise exposure, initial and periodic audiometric tests and maintenance of test results and follow-up analysis. See Exhibit 1B at Foss 0455-57. By this time Dyer knew and recommended to Foss that the NAVIC 12-82 was the guideline which should be used by Foss, to protect the Foss engineers.

20. In August 1984, Dyer's memorandum was still being discussed. See Exhibit 1B at Foss 0453. Meetings were held to discuss implementation of a noise control program as a result of NAVIC 12-82. Discussion continued through a meeting on January 9, 1986, to consider the recommendations of the March 23, 1984 memo from Dyer. See Exhibit 1B at Foss 0460. A "Safety Procedure Maritime Noise Control Program" was written and discussed in February,1986. See Exhibit 1B at Foss 0462-65. Unfortunately, prior to 1993, Foss failed to obtain and analyze baseline and audiograms for its maritime work force or otherwise implement the Dyer recommendations. Foss began providing hearing protection devices to both deckhands and engineers about 1985. However, prior to 1993, there were Foss vessels without hearing protection devices. Foss has continued to provide such devices to the present. These hearing protection devices provide some hearing attenuation protection to the noise levels if properly worn and maintained.

21. In 1993, OSHA conducted an inspection of Foss vessels and cited the defendant for failure to implement required noise reduction programs. Thereafter, Foss implemented a hearing conservation program and began testing workers for hearing loss.

22. At all times material after 1982, all Foss engine room personnel were known to be exposed to over 85 dB(A) for 8-hour equivalent, i.e. 77 dB(A) for 24 hours. As noted by Safety Officer Tom Dyer, as early as 1982, the then proposed 24-hour noise limit of 84 dB(A) for existing vessels "*could be difficult for our engine room personnel to meet because of the relatively high engine room noise levels found on tugs.*" [Emphasis added] Exhibit 1B at Foss 0451.

23. Prior to 1993, Defendant Foss failed to provide effective hearing protection devices and limit the duration of the workers spent in the Foss engine rooms. At no time material has Foss kept records of the time that each engineer spends in the engine room in order to limit the amount of time that the engineers would be exposed to high levels of noise in the engine room. Prior to 1993, Foss did not provide training in the use and the replacement of hearing protection devices, nor properly fit hearing protection devices for each individual's use. Without proper training and regular periodic replacement of the old hearing protection devices, the attenuation of the noise that the hearing protection devices

were supposed to provide decreases considerably.

24. Prior to 1993, Defendant Foss did not institute comprehensive and systematic audiometric tests to measure its marine employees' baseline hearing levels, as required by OSHA regulations, and as recommended by USCG NAVIC 12-82. The baseline audiograms serve as the basis from which each employees' hearing levels can be compared to the subsequent annual audiograms.

31. Even after 1993, Defendant Foss did not issue hearing protection devices to each employee. Instead, it continued its practice of issuing the devices to the vessels rather than to an individual employee. As a result, the proper selection, individual fitting, appropriate maintenance and regular replacement of the hearing protection devices did not take place. This resulted in a substantial decrease in the effectiveness of the hearing protection devices to protect employees' hearing, especially in the loud engine rooms.

32. After Foss was cited by OSHA for failure to institute and maintain an effective hearing conservation program for its marine employees in 1993, Foss complied with portions of OSHA regulations. However, Foss' compliance fell short of providing an effective hearing conservation program as outlined by the regulations. Specifically, Foss failed to comply with the OSHA requirements when an employee suffers a Standard Threshold Shift. A Standard Threshold Shift (STS) is defined by the OSHA regulations as a decrease of 10 or more decibels in the average hearing threshold of either ear at 2000, 3000 and 4000 Hz, as compared to the employee's baseline audiogram. If an STS occurs in either ear of an employee, OSHA requires the employer to notify the employee of the STS and to retest the employee's hearing, within 30 days of the initial testing that resulted in an STS. Furthermore, if an STS is confirmed by the retesting, the employer is required to take proactive steps in analyzing the cause of the hearing loss, and to prevent further hearing loss, including retraining and refitting of the hearing protection devices.

CONCLUSIONS OF LAW
(1, 4)

1. The Court has admiralty and general maritime law jurisdiction over this case pursuant to 28 U.S.C. §1333, as well as under the Jones Act, 46 U.S.C.App. § 688.

4. OSHA regulations regarding noise exposure govern uninspected vessels in navigable waters. Herman v. Tidewater Pacific, Inc., 160 F.3d 1239 (9th Cir. 1998); Donovan v. Red Star Marine Services, Inc., 739 F.2d 774 (2nd Cir. 1984). Foss' failure to comply with the OSHA regulations did not constitute negligence per se. However, OSHA regulations provide strong evidence of the standard of care required by Foss on its uninspected vessels after 1984. See Robertson v. Burlington N. R.R. Co., 32 F.3d 408, 410-11 (9th Cir. 1994). The Court rejects plaintiff's contention that a violation of an OSHA regulation constitutes negligence per se, shifts the burden of proof on causation and forecloses any evidence of comparative fault. See plaintiff's trial brief, docket no.56 at 28-30. The Pennsylvania Rule set forth in The Pennsylvania, 86 U.S. 125, 136 (1873) does not apply in the context of an OSHA violation. See Jones v. Spentonbush-Red Star Co., 155 F.3d. 587, 595-96 (2nd Cir.1998). Cf. Robertson v. Burlington N. R.R. Co., 32 F.3d. 408, 410-11 (9th Cir. 1994).

**D.     Issues Remaining for Trial**

For McCoy to establish his right to maintenance and cure, he still must show that he was

1 injured while in the employment of Foss.  In order to prove unseaworthiness, a plaintiff must
2 show that a ship owner failed to provide a safe place to work and knew, or should have known,
3 of the unsafe condition.  <u>Havens f. F/T Polar Mist</u>, 996 F.2d 215, 218 (9th Cir. 1993).  Although
4 the Court has adopted many of the general factual findings from the <u>Montaperto</u> action that led
5 that court to conclude that the Foss tugs were unseaworthy, the Court declines to adopt that
6 conclusion of law here in order to allow Foss the opportunity at trial to show it acted
7 exceptionally with regard to McCoy or a specific tug to which McCoy was assigned.  Finally,
8 McCoy must establish duty, breach, notice and causation for a Jones Act claim.  <u>Ribitzki v.
9 Canmar Reading & Bates, Ltd.</u>, 111 F.3d 658, 662 (9th Cir. 1997).  Although McCoy will be
10 able to argue that some elements are established through the <u>Montaperto</u> factual findings, he still
11 must make an individualized showing of his own treatment and injury.

### IV. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED plaintiff's motion for summary judgment based on collateral estoppel (Dkt. # 17) is GRANTED IN PART, in accordance with the factual findings and legal conclusions set forth in part III.C, above.

DATED this 31st day of May, 2006.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge